UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-20065-CR-SEITZ

UNITED STATES OF AMERICA,

Plaintiff,

vs.

OSCAR MAURICIO HENAO-TORO,
CARLOS ARTURO CEREN,
OMAR MUNOZ,
JHON JAIRO OCHOA-MESA,
CARLOS ZULUAGA-OCHOA,
MANUEL JOSE CARDONA-OSORIO
EDGAR EMILIO SIMMONDS-GALLARDO,

Defendants.

_____/

## ORDER DENYING MOTION TO DISMISS OF DEFENDANTS OCHOA-MESA, SIMMONDS-GALLARDO, CEREN, ZULUAGA-OCHOA, HENAO-TORO, MUNOZ AND CARDONA-OSORIO

THIS MATTER is before the Court on the two Motions to Dismiss the Indictment filed by

Defendants Jhon Jairo Ochoa-Mesa and Edgar Emilio Simmonds-Gallardo [DE-694] and Defendant

Ceren [DE-696], in which Defendants Zuluaga-Ochoa, Henao-Toro, Munoz, and Cardona-Osorio

have joined. The two motions seek to dismiss the Superceding Indictment [DE-551] for violation

of the Defendants' due process rights for pre-indictment delay and their speedy trial rights for post-

indictment delay.

The Court has considered the motions, the Government's response [DE-705], Defendants'

reply to the Government's response [DE-715] and their supplemental memorandum [DE-739],

Defendants' proffer of expected testimony [DE-734], the Affidavit of Ceren [DE-735], Defendants

-1-

Ochoa-Mesa and Simmonds-Gallardo's Notice of Filing of excerpts of the Office of the Inspector General 2007 Report on DEA's International Operation [DE-736], the testimony of two live witnesses, namely DEA Special Agents Dennis Hocker and John Oldano, and the testimonial proffers of AUSA Joseph Cooley and Col. Danilo Walteros at the evidentiary hearing on March 11 and 15, 2010, the Government's post-hearing response to the supplemental memorandum [DE-747], Ceren's [DE-748] and Ochoa-Mesa and Simmonds-Gallardo's replies thereto [DE-755], the argument of counsel and the record in this case. For the reasons discussed below, the Court will deny the motions because the Defendants have not met their burden to establish a violation of their Fifth and Sixth Amendment rights.

FACTUAL BACKGROUND

This case involves a large-scale international drug distribution network that, for almost ten years, moved cocaine from Colombia to Jamaica into the Bahamas and ultimately into the United States, and then moved the drug proceeds back to Colombia using various contacts, including those in Panama and the Dominican Republic. To aid in this discussion, the facts relevant to the motions are grouped into three phases: The Initial Indictment Phase (January 2003 to December 2006), the Ramcharan Phase (January 2007 to March 2008) and the Superceding Indictment Phase (April 2008 to January 2010).

***Phase One – Initial Indictment***

On January 28, 2003, the Colombian National Police (CNP) initiated an investigation into several members of the drug trafficking network including Gabriel Zuniga (aka Ito), Ceasar Augusto Mantilla-Chavez (aka Kung Fu and Lucho) and Julio Segundo Pereira Plata. The CNP intercepted telephone calls to and from these individuals and with others. The phone interceptions, plus human

intelligence and the cooperation of an individual in Jamaica allowed Jamaican authorities in August 2003 to seize approximately 725 kilograms of cocaine moved by the drug trafficking network to which Zuniga, Mantilla-Chavez and Pereira Plata belonged. Leebert Ramcharan (aka Indio, Indian, Father) and Everett Donovan Williams were the drug trafficking conspiracy's Jamaican leaders who organized the transhipments of the drugs to the United States.

The CNP initially worked with British authorities on the investigation. In May 2003, the United States became involved and Miami DEA Special Agent Dennis Hocker and Assistant United States Attorney Joseph Cooley were assigned to the investigation. AUSA Cooley reviewed translated transcripts of the wiretaps provided by the CNP as well as other evidence of the large international drug trafficking conspiracy.

On January 30, 2004, a Grand Jury sitting in Miami returned a sealed indictment against Ramcharan, Zuniga, Mantilla-Chavez, Pereira Plata, Williams, and nine other individuals.[1] The initial indictment charged two conspiracy counts and one substantive count. Count 1 charged the initial Defendants with conspiracy to import five or more kilograms of cocaine into the United States beginning on an unknown date in 1998 until the date of the indictment. Count 2 alleged a drug possession and distribution conspiracy beginning in February 1998 and continuing until the date of the indictment. Count 3 charged the initial Defendants with attempted importation of drugs into the United States on or about August 9, 2003.

---

[1]The nine other Defendants were Maria Elena Luna Barraza (Zuniga's wife aka Mayo), James Aguirre Cortes, Ramon Galvis Saenz (aka Padrino), Ramon Jovanni Galvis Rubio (aka Jovanni), Rafael Enrique Pereira (aka Rafa), Jose Elias Rosado Pereira (aka Chema), William Osiris Valencia-Diaz (aka Cachete), Mickey Morris, and Clasford Morris (aka Cazi). The indictment against Galvis Saenz was later dismissed on May 22, 2009. [DE-584].

On April 23, 2004, the indictment was unsealed.  On August 12, 2004, the process for extraditing Ramcharan from Jamaica began.  Between December 20, 2004 and September 16, 2005, six of the initial Columbian Defendants arrived in the United States to commence the U.S. criminal process.[2]  Starting in late November 2005 through May of 2006, all six of these Defendants pled guilty and were sentenced.[3]

In March 2005, some of these Defendants began to cooperate with the Government.  Prior to their cooperation efforts, Agent Hocker and AUSA Cooley had not discovered the seven Defendants who filed the instant motions.  As part of the debriefing process, the cooperators listened to the numerous tapes of the intercepted calls which had been given to them during discovery and identified voices of those with whom they had worked in the drug trafficking network.  Because the tapes were extensive and the object was to identify the members of the entire organization, this process took considerable time.  The cooperators would give Agent Hocker the alias or names by which they knew the individuals whose voices were captured on the tapes.[4]  As the cooperators'

---

[2]The first was Rosado Pereira followed by Aguirre Cortes on January 15, 2005, Mantilla-Chavez on January 25, 2005, Ramon Galvis Rubio on April 15, 2005, Zuniga on August 31, 2005, and Maria Elena Luna Barraza on September 16, 2005.

[3] The dates of the pleas were:  Rosado Pereira on November 16, 2005, Barraza on January 6, 2006, Zuniga and Galvis Rubio on February 13, 2006, Mantilla-Chavez on February 16, 2006, and Aguirre Cortes on February 21, 2006.  The sentencings for the most part were consistent with standard timing for the pre-sentence investigation process.  Zuniga appealed his sentence.

[4]The dates on which each of the seven Defendants named in the Superceding Indictment were first brought to the Government's attention were:  (1) Omar Munoz, Carlos Arturo Ceren, Edgar Emilio Simmond-Gallardo, March, 2005; (2) Oscar Henao-Toro in 2005 by his nickname El Contador, his full name became known by mid-2006; (3) Jhon Jairo Ochoa-Mesa was identified in 2006-2007; (4) Carlos Zuluaga Ochoa was identified by his alias in late 2006; (5) probable cause was established as to Manuel Jose Cardona-Osorio also in 2006, but he was identified only as Manuel Cardona, not by his full name.

information was corroborated and the pertinent conversations identified, Agent Hocker, who is not

fluent in Spanish, sent the tapes of the identified conversations to a Utah translation service so that

transcripts could be made. The Utah service was used for economic reasons. As probable cause was

established for the new targets, Agent Hocker asked his counterpart in Columbia to secure copies

of any Columbian cedulas[5] of persons whose names were similar to, or close matches to, the names

that he had been given. Agent Hocker planned to show the cedula photographs to the cooperating

Defendants to ensure that he had correctly identified the person about whom the cooperators were

talking. This process took some time because Agent Hocker did not have a complete name, had an

incorrectly spelled name, or a very common name.[6]  Also, his counterpart had to make an official

request for authorization to obtain and provide copies of the cedulas.[7] Once Agent Hocker obtained

the cedula photos, he showed them to the cooperating Defendants. He showed them Ochoa-Mesa's

picture in August 2006.  In November and December of 2006, Agent Hocker showed them the

pictures for Ceren and Simmonds-Gallardo, respectively, and in January, 2007, he showed them the

---

[5]The Columbian cedula is the Columbian national identity card.  It is similar to a combination of a U.S. social security number and state driver's license with a photograph, descriptive characteristics of height, age, etc.

[6]The Defendants' nicknames are:  (1) for Henao-Toro, "Mauro" and "El Contador" (Agent Hocker did not obtain his complete name Oscar Maruricio Henao-Toro until mid-2006); (2) for Ceren, "Coste" and "Costeno;" (3) for Omar Munoz, "Alfonso;" (4) for Ochoa-Mesa, "Jota;" (5) for Carlos Zuluaga-Ochoa, "Alcalde" and "Gobernador" while his brother, Mauricio Zuluaga-Ochoa, was known as "Culiseco;" (6) for Cardona-Osorio, "Manolo;" and (7) for Simmonds-Gallardo, "El Chorro" and "Moises."

[7]The cedula numbers were also essential for obtaining provisional arrest warrants after the Superceding Indictment was returned in 2008. Extradition for criminal prosecution in the United States is a sensitive subject in Columbia. Unfortunately, in other cases, there have been a couple of individuals wrongly extradited.

photos of Cardona-Osorio and Zuluaga-Ochoa. He did not obtain a cedula picture of Munoz until November 2008; the cooperating Defendants identified Munoz by cedula on December 4, 2008.

From March 2005 and through the Fall of 2006, AUSA Cooley participated in some of the debriefings with the cooperating Defendants.[8]  However, beginning in the Fall of 2006, AUSA Cooley did not work on the case due to his mother's illness and death in late November 2006, and in January 2007, he left on a one-year detail to Afghanistan. On February 7, 2007, the case was reassigned to AUSA Alicia Shick. AUSA Arthur Wyatt joined her in August 2007 to prosecute the case against Ramcharan and Williams.

## Phase Two – Ramcharan Phase

On January 11, 2007, a second group of the initial Defendants began to arrive in the United States starting with Rafael Enrique Pereira, and followed on March 20, 2007 by Ramcharan, Williams, and Julio Pereira Plata.[9]  On April 20, 2007, Pereira Plata indicated a desire to plead guilty, which he did on June 18, 2007. Ramcharan and Williams, on the other hand, elected to file a number of pretrial motions, some requiring evidentiary hearings, and to go to trial. They moved jointly with the Government to continue the initial June 2007 trial date, and later were granted an unopposed continuance of the August 2007 trial date. On July 31, 2007, the Court of Appeals issued its mandate affirming Zuniga's sentence. Shortly thereafter, the Government filed disclosures of

---

[8]The debriefings produced more than just voice and photo identifications.  In May 2006, one of the cooperating defendants arranged for the partial payment of a $10,000 drug debt by Gilberto Sanchez-Rico connected to a 2003-2004 drug shipment by the conspiracy. Sanchez-Rico was also charged in the Superceding Indictment but he has not moved to dismiss the indictment.

[9]A belated member of this second wave was William Osiris Valencia-Diaz. He had his initial appearance on October 1, 2008, pled guilty on December 15, 2008 and was sentenced on March 31, 2009.

cooperating unindicted Jamaican co-conspirators, Paul Dixon and Alexander Duffis Young, as well as that of Zuniga. At the September pre-trial conference, Ramcharan and Williams requested and received another trial continuance until November 26, 2007.[10] In late October 2007, following the magistrate judge's denial of their motion to suppress the Bahamian wiretaps, Ramcharan and Williams requested another trial continuance and the Government dismissed Count 3 as to them. The trial was reset and finally began on January 10, 2008. More than seven weeks later, on March 6, 2008, the jury returned guilty verdicts as to Counts 1 and 2 against both Ramcharan and Williams. Ramcharan was sentenced on May 23, 2008 and Williams on June 25, 2008.[11]

During the Ramcharan Phase, Case Agent Hocker was focused primarily on assisting AUSA Shick and Wyatt with the pre-trial matters and trial of the case against Ramcharan and Williams. Meanwhile, also during 2007, Columbian authorities conducted wiretaps of the identified leader of the drug trafficking organization, Nelson Eugenio Aristizabal-Martinez, aka "1,2,3" and "LaFirma." By the end of the Ramcharan trial, AUSA Cooley had returned from his Afghanistan detail and Agent Hocker resumed working with him to prepare the Superceding Indictment based on the investigations that began with the cooperating Defendants in March of 2005. The Superceding Indictment would add 15 new Defendants: Aristizabal-Martinez, Henao-Toro, Ceren, Munoz, Ochoa-Mesa, Mauricio Zuluaga-Ochoa, his brother Carlos Zuluaga-Ochoa, Cardona-Osorio, Simmonds-Gallardo, Gilberto Sanchez-Rico, aka "Carnaval," Luis Fernando Castano-Alzate, aka

---

[10]A few days before the pre-trial conference, Pereira and Pereira Plata requested continuances of their sentencings until January, 2008. In January, their sentencings were again continued. Pereira Plata was sentenced on March 5, 2008 and Pereira was sentenced on April 14, 2008.

[11]Both took appeals and the mandates affirming their convictions were issued January 5, 2010.

"Botija," Fabio Gutierrrez-Pacheco, aka "Cana," Canarete" and Gigante," Ramon Perez, aka "El Gordo," and two non-Columbian members of the organization, Oscar Pinder and Trevor Lewis Sunders, aka "Tom Cruise."

**Phase Three – Superceding Indictment**

April 13, 2008 marked the date that DEA Special Agent John Oldano arrived in Bogota, Columbia to be the country special agent. Previously, he had been assigned to money laundering investigations in New York. Agent Oldano met with Agent Hocker and AUSA Cooley in Colombia and was made aware of the investigation, its impending superceding indictment, that its primary target was Aristizabal and he learned of Henao-Toro. Prior to the return of the new indictment, Agent Oldano reached out to his Columbian counterpart in a 15 to 20 member vetted Special Investigative Unit (SIU)[12] to obtain its assistance in locating the new Columbian Defendants. He requested wiretaps to assist in their location. However, he felt his efforts were frustrated to the point that nothing happened due to the leadership style of the person in charge of the SIU, Officer L*.[13] In Agent Oldano's opinion when Officer B* replaced Officer L*, the group was transformed and the

---

[12]In Columbia, these vetted units are part of DEA's Sensitive Investigative Unit (SIU) Program. This is an official DEA program for which Congress has designated specific SIU locations in various countries. Each DEA foreign office that is part of the SIU Program receives funds specifically to maintain its SIUs. These funds are used to pay for operation-related costs, such as travel expenses, and equipment for SIUs to use during investigative activities. There are also salary supplements that can be paid to SIU members. SIU members participate in a specially designed training course at the DEA Training Academy in Quantico, Virginia. DEA has developed an SIU Program Manual detailing guidelines for both DEA headquarters and its foreign offices to follow in administering the SIU program and in managing SIU activities.

[13]Because of the sensitive nature of SIU investigations, the names and ranks of the officers involved are indicated by a first letter and an asterisk and the testimony identifying the individuals has been sealed.

necessary cooperation efforts were "back on track not only with this investigation but with other investigations also."[14]

On May 30, 2008, the Superseding Indictment was returned and sealed and U.S. arrest warrants were issued. [DE-551]. This Indictment alleges two narcotics conspiracies from January 1997 until May 2006 (Counts One and Two) and alleges two substantive counts of attempts to import over 5 kilograms of cocaine into the United States on or about August 9, 2003 and September 3, 2003 (Counts Three and Four, respectively).[15]

On July 15, 2008, the case was formally reassigned to AUSA Cooley. Several weeks later, in August, 2008, he began the process to obtain Provisional Arrest Warrants (PAWs). Without a PAW a defendant may not be arrested in a foreign country. The PAW process starts with an AUSA's submission of the appropriate paperwork to the Department of Justice's International Affairs Office in Washington, D.C. That Office then submits the necessary paperwork to the State Department, which then forwards to the embassy in the relevant country the paperwork required to obtain the PAWs. The process in Columbia averages about two to four months. The timing is affected by the number of extradition requests in the embassy – in the past five to six years over 1,000 Columbians have been extradited to the United States.

While the PAW paperwork was moving through the various channels, the CNP was working to locate the 12 new Columbian Defendants using such aids as wiretaps and surveillance techniques. It was important to pinpoint the location and routine of each Defendant because the plan was to

---

[14]While Agent Oldano could not recall the exact date the replacement took place, it had occurred by early September 2008.

[15]The superceding Indictment was unsealed on March 17, 2009. [DE-553].

arrest all Defendants at the same time to ensure that none avoided arrest. Thus, once the U.S. Embassy in Columbia issued the PAWs, the Colombian authorities' goal was to effect the arrests as soon as possible so that information would not be leaked and tip off the Defendants. Two factors enhanced the logistical challenges in the arrests. They were the number of Defendants and their spread-out locations. The Defendants were in five or six cities ranging from Medellin, to the small remote town of San Roque, to the town of Caldas, to the coastal city of Barranquilla. The arrest operation involved approximately 150 CPN officers.

In late October 2008, Agent Oldano's contacts at the SIU advised him that it was having difficulties locating all Defendants and asked for more time.[16] Agent Oldano informally spoke with the Judicial Attache at the embassy, who passed on his comments to the section in the Embassy that handled the issuance of the PAWs.

On December 1, 2008, the case was reassigned to AUSA Adam Fels. Also in December 2008, the conversations intercepted as a result of Agent Oldanos' request for a Colombian judicially authorized wiretap indicated that Aristizabal had been kidnaped and was believed to be dead.[17] This information intensified the efforts to locate the Defendants and arrest them. The thinking was that

---

[16]The testimony was that but for the difficulties, the original take-down date would have been December 9, 2009. Examples of the difficulties included the difficulty in locating Sanchez-Rico, whom they had established traveled back and forth from Jamaica to Colombia. They also had difficulty pin-pointing the location and routine of Aristizabal because he had access to numerous properties, including large "fincas," traveled within Colombia a lot as well as traveled between Colombia, the Dominican Republic and Jamaica. Cardona-Osorio was located only two days before the actual arrest in February 2009. They did not have difficulty locating Henao-Toro.

[17]The wiretaps intercepted the calls of five of the seven Defendants who have moved to dismiss the indictment. The CNP did not intercept the calls of Simmonds-Gallardo and Cardona-Osorio.

with the leader believed to be killed, the organization would be in disarray, there would be a leadership vacuum and some participants might flee.

The PAWs were issued on February 6, 2009 and the arrests occurred on February 11 and 12, 2009.[18] At that time, however, the Colombian authorities were not able to arrest Simmonds-Gallardo or Mauricio Zuluaga-Ochoa.[19]  After their arrest in Colombia, Defendants Henao-Toro, Ceren Munoz, Ochoa-Mesa, Carlos Zuluaga-Ochoa, and Cardona-Osorio were placed in Combita, a Colombian prison,[20] while the extradition process moved through the Colombian judicial system. Munoz was the first to be extradited and was formally arrested in the United States on September 19, 2009.[21] Ochoa-Mesa, Carlos Zuluaga-Ochoa and Sanchez-Rico were the next to arrive and began the U.S. criminal process on approximately October 13, 2009. They were followed by Henao-Toro, who was formally arrested on October 27, 2009. Two days later, Simmonds-Gallardo arrived and was arrested.[22] At the November 5, 2009 calendar call for Munoz's trial, the parties jointly requested

---

[18]Defendants' counsel have stated that their clients were living openly at longstanding, disclosed locations. However, only Defendant Ceren has filed an affidavit to this effect. The other Defendants' counsel simply have made the statements and asked Agent Oldano whether he was aware that a particular Defendant had been living at a particular location for a particular amount of time. Counsel also asked the agent whether the Columbian wiretaps he had requested also provided clues to at least five of the Defendants' locations. The agent indicated that there were unspecified differences between the Columbian and U.S. intercept equipment.

[19]At the March 2010 hearing on the motions, Counsel for Carlos Zuluaga-Ochoa stated that Mauricio Zuluaga-Ochoa was deceased, but that has not yet been confirmed by a death certificate.

[20]The prison conditions at Combita were the subject of an Amnesty International Report in 2003 and have caused at least two judges in other cases to take those conditions into consideration to justify a downward variance at sentencing.

[21]His trial was initially set for November 2009.

[22]The Columbian authorities were unable to arrest Simmonds-Gallardo in February 2009. Some months later he initiated contact with the DEA to come to the United States and self-

a continuance because four more Defendants were expected to arrive shortly. Thus, a status conference was held on December 3, 2009 to set a case management plan. As a result of that conference, the Court entered a trial order on December 4, 2009 which reflected the Defendants' speedy trial waiver, required any motions to dismiss to be filed by January 11, 2010, and set the trial for August 2, 2010. [DE-667]. Thereafter, Ceren arrived and was formally arrested on December 15, 2009[23] and Cardona-Osario was formally arrested on January 26, 2010. These last two Defendants also agreed to speedy trial waivers and to the August 2, 2010 trial date. [DE-685 & 714]. The two Motions to Dismiss the Superceding Indictment were filed on January 11 and 12, 2010 on behalf of Simmonds-Gallardo and Ochoa-Mesa [DE-694] and Ceren [DE-696], respectively.[24]

## DISCUSSION

### I. Parties' Positions

The essence of Defendants' motions is that the Superceding Indictment should have been returned in 2005, or at the latest, in early 2007 when their identities were known to the Government. They argue that a six-year delay between the last substantive act alleged in September 2003, to the indictment's return on May, 30, 2008, combined with the delay in their arrest in Columbia in February 2009, so substantially prejudices their ability to defend against the charges that the Fifth and Sixth Amendments require dismissal of the indictment. They assert that they have suffered

---

surrender. He surrendered on October 29, 2009. Thus, he did not go through the extradition process nor was he confined in Combita.

[23]Even before Ceren arrived in the United States, his counsel had, on June 16, 2009, filed a notice of appearance on his behalf. [DE-586]. Until Ceren physically arrived in the United States in December 2009, he was not provided discovery. His counsel had previously represented Barraza, one of the initial Defendants.

[24]After the deadline for filing the motions to dismiss, Defendants Ochoa-Mesa and Simmonds-Gallardo filed a supplement to their motion asserting an additional grounds.

actual prejudice due to: (1) a governmental delay that obtained a tactical advantage, (2) the "oppressive pretrial incarceration" in Combita, and (3) the loss of non-specified exculpatory witnesses and evidence because it is now nearly seven years since the last substantive act alleged in the indictment and thirteen years since the alleged inception of the conspiracy. As legal support for their position, the Defendant's rely principally on the decisions of United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972), and *Doggett v. United States*, 505 U.S. 647 (1992), of the Eleventh Circuit in *United States v. Foxman*, 87 F.3d 1220 (11th Cir. 1996) and *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006), and that of The Honorable Marcia Cooke in *United States v. Velez*, Case No. 05-Cr-20770, Southern District of Florida, Docket Entry 222 in that case. They particularly rely on *Ingram* and *Velez* to support the argument that a court must consider both pre- and post-indictment delay in assessing the prejudice prong of a speedy trial violation.

Defendants Ochoa-Mesa and Simmonds-Gallardo's supplemental memorandum [DE-739] maintains that both the substantive and conspiracy charges of the indictment must be dismissed with prejudice because the statue of limitations has expired. The supplemental memorandum focuses on the allegations in the Superceding Indictment that the drug conspiracy continued until May of 2006 because of the payment of a drug debt related to the conspiracy's 2003-2004 importation efforts.[25] The supplement argues that a Government agent's actions cannot artificially extend the life of a conspiracy and there is no evidence that the agreed upon purpose of the conspiracy was either to collect debts owed to its members or to conceal its existence so as to extend the life of the conspiracy beyond September 3, 2003.

---

[25]It appears that initial Defendant Mantilla-Sanchez, after he began cooperating and at the direction of U.S. law enforcement, persuaded new Defendant Sanchez-Rico to pay the drug debt using another member of the conspiracy.

In opposing the initial motions, the Government maintained that the Defendants are using an incorrect "hybrid" approach in their motions, that pre-indictment and post-indictment delays must be examined separately because they invoke different rights (due process versus speedy trial) to which different standards apply, and the Defendants have failed to meet their burden to satisfy the standard for either. In responding to Defendants' supplemental memorandum, the Government makes three arguments. First, it asserts that the Defendants cannot claim Constitutional violations for pre and post-indictment delay while they were outside of the United States because as Colombian citizens without any substantial connection to the United States, they did not possess Fifth and Sixth Amendment rights until they were extradited and came within United States borders. The Government also elaborates on its earlier position that the Defendants' "hybrid" approach ignores the law and incorrectly conflates the pre- and post-indictment analysis. Finally, it maintains that the extension of the statute of limitations issue is for the jury rather than the Court to decide.

## II. Legal Standards

Any determination of a violation of rights due to a delay in a criminal prosecution involves a highly intensive factual analysis within the context of the particular case. *Barker v. Wingo*, 407 U.S. at 522. Because different rights are involved in pre-indictment versus post-indictment delays, two different standards apply. Because of the Government's new issue in its response to the supplemental memorandum, the Court must first consider whether the Defendants have standing to assert a violation of these rights.

### A. Standing

The Government raises a standing issue which this Court has not previously considered in a criminal case. The Government's response traces the historical development of the Supreme Court

-14-

precedent to support its position that the Defendants did not have either Fifth or Sixth Amendment protections while they lived in Colombia unaware of the pending investigation and indictment. The response begins with *Ross v. McIntyre*, 140 U.S. 453 (1891), which held that a non-U.S. citizen convicted in a United States consular court in Japan did not have a right to a jury trial, and proceeds to the early 1900 *Insular Cases*[26] which held that provisions of the Sixth and Seventh Amendments did not extend to unincorporated territories of the United States, and then discusses *Johnson v. Eisentrager*, 339 U.S. 763 (1950), a case involving German nationals confined in Germany by the United States Army, which held the Fifth and Sixth Amendments did not apply to non-resident aliens who were beyond the borders of the United States. The Government then cites *Reid v. Covert*, 354 U.S. 1 (1957), a plurality decision that expanded the application of Constitutional protections to prosecutions by military tribunals of U.S. civilians living abroad on U.S. military bases. The Government notes, however, that the *Reid* concurrences declined to hold that United States citizens living abroad were entitled to the full panoply of Constitutional rights in all overseas criminal prosecutions.

Examining the more recent Supreme Court decisions that address the extraterritorial application of Constitutional rights, the Government cites *United States v. Verdugo-Urquidez*, 494 U.S. 259, 275 (1990), which held that the Fourth Amendment does not apply when American authorities conduct searches on foreign soil of property belonging to individuals who are neither citizens, U.S. resident aliens, nor individuals with "voluntary attachment" to the United States. Again, the Government points out that the Supreme Court cited its holding in *Eisentrager* and

---

[26]*See, eg., Dorr v. United States,* 195 U.S. 138 (1904); *Hawaii v. Mankichi,* 190 U.S 197 (1903).

reaffirmed its rejection of the extraterritorial application of the Fifth Amendment to aliens living outside of the United States. *Verdugo-Urquidez*, 494 U.S. at 269. In *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), an immigration administrative detention case, the Supreme Court reaffirmed its holdings in *Eisentrager* and *Verdugo-Urquidez,* namely that Fifth Amendment rights apply only to aliens within United States borders and does not apply outside those borders.

The Government acknowledges that the Supreme Court's recent decision in *Boumediene v. Bush*, 553 U.S.723, 128 S.Ct. 2229 (2008), distinguished the holding of *Eisentrager* when it held that non-citizens detained in Guantanamo Bay, Cuba do have due process rights to file habeas corpus petitions to challenge the legality of their detentions. However, the Government argues that the Supreme Court specifically recognized that detainees in that case presented a unique factual situation lacking any precise historical parallel. *Id.* at 2262. Finally, the Government cites lower court decisions which have discussed the application of the Fifth and Sixth Amendments extraterritorially. Those cases are: *United States v. Wanigasinghe*, 545 F.3d 595, 597 (7th Cir. 2008)(affirming denial of speedy trial challenge of an 11-year delay in a criminal prosecution and cautioning against broad pronouncements of whether a right to speedy trial existed in the case); *Atamirzayeva v. United States*, 524 F.3d 1320, 1321 (Fed. Cir. 2008)(affirming judgment on the pleadings against plaintiff, a citizen of the Republic of Uzbekistan, in a Takings Clause challenge arising out of destruction of a cafeteria next to the U.S. Embassy in Tashkent); *United States v. Raven*, 103 F.Supp.2d 38 (D.Mass. 2000)(denying criminal defendant's motion to suppress statements given in Belgium to American and Belgian authorities without the presence of counsel); and *Rosner v. United States*, 231 F.Supp.2d 1202, 1213-14 (S.D.Fla. 2002)(dismissing with prejudice a Takings Clause challenge by

former Hungarian citizens arising out of the U.S. Army use of their stolen property in Austria at the end of World War II).

The Defendants' response begins with the comment that as part of the extradition process, the Government provided certain "assurances" to the Colombian Government which "included that the extraditees would not be deprived of life or liberty without due process." [DE-755 at 3]. Defendants distinguish the Government's authorities by noting that none involved foreign extraditions and that the Government's analysis "generally involved the application of U.S. constitutional rights to matters occurring abroad." [DE-755 at 7 n.4]. Defendants also cite examples of extradition cases which applied the *Barker* analysis, namely, *United States v. Corona-Verbera*, 509 F.3d 1105 (9th Cir. 2007)(affirming denial of dismissal of indictment against extradited Mexican national in a drug conspiracy case after applying due process analysis to pre-indictment delay and the *Barker* analysis to the eight-year delay between indictment and arrest); *United States v. Tchibassa*, 452 F.3d 918 (D.C. Cir. 2006)(affirming denial of an extradited Angolan national's speedy trial challenge of a nearly 11-year delay between indictment and arrest); *United States v. Fernandes*, 618 F.Supp.2d 62 (D.D.C. 2009)(granting motion to dismiss of a U.S. citizen extradited from India due to a 23-month delay between indictment and arrest); *United States v. Reumayr*, 530 F.Supp.2d 1200 (D.N.M. 2007)(denying extradited Canadian national's motion to dismiss for 87-day pre-indictment delay and six and a half year post-indictment delay); and finally, *United States v. McDonald*, 172 F.Supp.2d 941(W.D. Mich. 2001)(granting dismissal of Bahamian national's challenge of a 15-year delay due to Government's failure to seek extradition). Finally, the Defendants reiterate their argument that they made no effort to hide after the Initial Defendants were arrested in 2004 and the CNP was aware of most of their locations through the 2008 wiretaps.

The *Wanigasinghe* court's caution about broad pronouncements on the existence of rights to a speedy trial is well taken. Moreover, while the Supreme Court has not receded from its *Eisentrager* holding as to the application of due process rights, the Government's authorities all involve the application of constitutional rights in extraterritorial locations. The circumstances presented in those cases are not present in this case. Here, the Defendants are within the borders of the United States. Their challenge focuses only on those Government actions which occurred within these borders and they assert the rights that attend every other criminal defendant subject to prosecution by the United States within its borders. Given the lack of precedent even questioning the existence of such rights for defendants similarly situated to these Defendants, the Court sees no basis nor need on this record to deny the Defendants' motions on the grounds that they do not have standing to assert a violation of their due process or speedy trial rights. Therefore, the Court will address the merits of the motions.

B. Pre- and Post-Indictment Standards

In pre-indictment delay situations, the statue of limitations usually sets the limit on pre-indictment delay. However, the Due Process Clause can bar an indictment even when the indictment is returned prior to the expiration of the limitation period. *Foxman*, 87 F.3d at 1222. What a court must determine in pre-indictment delay cases is whether the defendant has clearly shown both (1) actual substantial prejudice and (2) that the Government has deliberately delayed the filing of the indictment to gain some type of advantage. *Id.* Even when a defendant can show actual prejudice, however, if the delay was due to investigative reasons or a prosecutor's desire to have more than probable cause evidence, such as sufficient evidence to prove guilt beyond a reasonable doubt, a defendant is not deprived of due process. *United States v. Lovasco*, 431 U.S. 783, 795 (1977);

-18-

*United States v. Thomas*, 62 F.3d 1332, 1339 (11th Cir. 1995); *United States v. Hayes*, 40 F.3d 362, 365 (11th Cir.1994); *United States v. Benson,* 846 F.2d 1338 (11th Cir. 1988); *United States v. Solomon*, 686 F.2d 863, 872 (11th Cir. 1982)(three-year delay to obtain corroboration valid reason for delay).

In post-indictment delay cases, a court must apply the four-factor *Barker* test which examines: (1) the length of the delay; (2) the reason for delay; (3) the defendant's assertion of the speedy trial right; and (4) the prejudice to the defendant. 407 U.S.at 530-32. Before a court may undertake an analysis of the final three factors, however, a defendant must first show that the delay between the indictment and trial was "presumptively prejudicial." *Doggett*, 505 U.S. at 651-52. Delays exceeding one year between indictment and trial are generally found to be presumptively prejudicial. *Ingram*, 446 F.3d at 1336. Assuming a defendant satisfies the threshold issue, in the Eleventh Circuit, unless the first three factors weigh heavily against the Government, the defendant must also establish actual prejudice. *United States v. Harris,* 376 F.3d 1282, 1290 (11th Cir. 2004). Delays for valid reasons do not weigh against the Government, while actions that are taken in bad faith or are dilatory do. *United States v. Schlei*, 122 F.3d 944, 987 (11th Cir. 1997). Governmental negligence is more of a neutral act and is not to be weighed the same as bad faith. *Barker*, 407 U.S. at 531.

The Court has applied these two standards to the facts of this case. As discussed below, it finds that a three-year pre-indictment delay did not deprive the Defendants of their right to due

process and the nine and a half-month delay between the return of the indictment and their arrests in Columbia did not violate their speedy trial rights.[27]

III. Pre-Indictment Delay Analysis

The Defendants did not introduce evidence as to the prejudice the pre-indictment delay has caused their defenses. They merely argued that phone records for 2003 are no longer available, it is difficult for them to establish alibis, to locate and obtain records and witnesses who are in Columbia, and memories fade when one has to recall the specifics of events that occurred in August 2003. The Court shares concerns that the Defendants would be prejudiced in these generalized ways. However, the pre-indictment delay standard requires that the Defendants produce evidence that shows the specifics of actual prejudice. It is a heavy burden and must be more than the generalized prejudice that plagues every defendant who is not indicted within a year of the last criminal act. *Foxman*, 87 F.3d at 1222 (evidence introduced showing the number of key witnesses who had died in the 10-year period in a predominately testimonial evidence conspiracy case, and defendant's lack of incentive to preserve evidence); *Benson*, 846 F.2d at 1341-42 (dismissal denied although evidence of eight-year delay, loss of two specific alibi witnesses, loss of passport, death of case agent who interviewed and believed defendant, destruction of evidence of his cooperation, etc.). Without such

---

[27]The time that it took for the Defendants to move through the Colombian extradition process cannot be considered in the speedy trial analysis. The legal principles governing extradition proceedings in this country should apply equally to corresponding proceedings in another country, namely that such are not ordinary criminal proceedings and constitutional guarantees that apply to criminal proceedings do not apply to extradition proceedings. *See Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 828-29 (11th Cir. 1993)(no due process right to speedy extradition). Moreover, as a practical matter, the Government cannot control a foreign sovereign's legal process which the sovereign is entitled to follow as established by its laws.

evidence the Court does not have a factual basis to find the required actual prejudice to trigger a constitutional violation. Thus, Defendants have not met the prejudice prong of their burden.

Moreover, the Defendants have not shown any evidence that the Government deliberately caused the delay to gain any tactical advantage. The testimony of case agent Dennis Hocker, the affidavit of the AUSA Cooley and the record in this case outlined above, which is undisputed, demonstrate that the delay was due to valid investigative needs. A prudent investigation would require the Government to ensure that not only has it identified the correct defendant, but also that it has proof to establish guilt beyond a reasonable doubt before indicting someone who will be extradited from a foreign country. Thus, based on the evidence presented, the efforts expended in the investigation were reasonable and valid investigatory activities. Those efforts began with having each cooperating defendant review the tape recordings and identify the relevant voices for the entire organization. The Government then had to translate and transcribe the pertinent conversations, and to corroborate the statements made in debriefings as to the 12 newly identified Colombian members of the conspiracies. To ensure the correct individuals were identified, it had to match full names, not just nicknames or aliases or partial names, with those voices and others identified in the debriefings, work with Columbian authorities and their system to obtain photos of the potentially identified individuals, and then have the cooperating Defendants confirm that the photos did depict the individuals they had identified. Given the number of previously unknown, different individuals who were identified, the difficulties presented when dealing with tapes in foreign languages and drug code, and the need to respect the different legal system of another sovereign nation, the Court cannot find that the Government engaged in deliberate delaying tactics.

While there was some delay due to AUSA Cooley's absence to attend to his mother in her terminal illness and to his detail to Afghanistan, the Government did assign two other prosecutors to the case when he left for overseas. Whether the Government could have assigned more prosecutors and whether the new prosecutors could and should have pursued the superceding indictment in 2007 while they were also prosecuting the hard fought case against Ramcharan and Williams, are speculative questions that raise, at best, an inference of Government negligence rather than evidence of intentional delay to gain an advantage. Furthermore, there is no evidence that the Government had been in contact with any of these seven Defendants prior to indictment much less lured them into thinking that they would not be subject to criminal prosecution for drug trafficking activities. Nor is there evidence that the Defendants had ceased any alleged criminal activities and been engaged in law-biding lives. Because the evidence does not support a finding that the Defendants have met their burden to establish either prong of the pre-indictment delay analysis, the Court finds that their due process rights were not violated due to pre-indictment delay. Thus, Defendants' motions on this ground must be denied.[28]

IV. Post-Indictment Delay Analysis

Turning to the post-indictment issues, *Barker* requires the Court to analyze four factors. The threshold factor, the length of delay, must exceed one year to trigger an analysis of the remaining factors, namely, the reason for delay, the assertion of speedy trial right, and prejudice; and the

---

[28]At this juncture it is not necessary to address the Defendants' supplemental statute of limitations basis for dismissal. The Superceding Indictment was returned two months and several days before the five-year limitations period expired if one uses the September 3, 2003 date as final conspiratorial act. The fact that the indictment was filed under seal for a period beyond the statute of limitations tolled the limitations period until it was unsealed. *United States v. Edwards*, 777 F.2d 644 (11th Cir. 1985). The Defendants have not challenged the decision to seal the indictment until their arrests.

Defendants retain the burden of proving these remaining factors. *United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996)(finding Defendant did not meet burden despite a 17-month delay).

### A. *Length of Delay*

The eight and a half-month delay between the indictment's return on May 30, 2008 and the February 11 and 12, 2009 Columbian arrests of six of the seven movants does not meet the presumptively prejudicial one-year threshold to require a *Barker* analysis. Thus, Defendants Ochoa-Mesa, Ceren, Heano-Toro, Munoz, Zuluaga-Ochoa and Cardona-Osorio cannot satisfy the first requirement to trigger the *Barker* analysis and their motions to dismiss on speedy trial grounds must be denied.

The seventh movant, Simmonds-Gallardo, was not at the location the Colombian authorities had for him, and thus managed to avoid arrest with the rest of the new Defendants. A number of months later he contacted the DEA in either Panama or Venezuela and arranged to self-surrender on October 29, 2009 in the United States, thus bypassing the Columbia extradition process and any confinement at the Combita Prison. However, because a 16-month delay between the indictment's return and Simmonds-Gallardo's arrest in the United States is sufficient to entitle him to the presumption of prejudice, the Court will undertake the *Barker* analysis. If the other six Defendants had satisfied the threshold issue, the Court would have undertaken a similar analysis for them.

### B. *Reason for Delay*

Once the superceding indictment was returned, AUSA Cooley did not start the process for issuing the PAW's until August, two and a half months after the indictment's return. Based on the testimony, sometime in October, the paperwork arrived at the U.S. Embassy in Colombia to issue the PAW's. The original takedown of the new Defendants was planned for early December, 2009.

-23-

However, the Colombian authorities asked the U.S. Embassy to delay the issuance of the PAW's. They were finally issued on February 6, 2009 and the arrests of all Defendants except Simmonds-Gallardo occurred within a week's time, on February 11 and 12, 2009. Thus, there was an eight and a half-month delay from the indictment's return before the arrest of Defendant Simmonds-Gallardo was even attempted. AUSA Cooley was definitely responsible for two and a half months of this delay. As to the remaining six months of this delay, part is attributable to the usual PAW process that involves coordination between the local U.S. Attorney's Office, the Department of Justice, the State Department and the U.S. Embassy in the host country. The evidence also establishes that the Colombian authorities requested that the U.S. Embassy delay the issuance of the PAWs for about two and a half months. The Court does not have any evidence of the reason for the request, but also has no evidence to suggest that actions of the United States Government precipitated this request. Moreover, the evidence reflects that the Government did make efforts to help the Colombian authorities locate the Defendant as quickly as possible by notifying the authorities that an indictment would be coming down before its return date and by requesting Colombian wiretaps to assist in the Defendants' location.

While the Defendants argue the Colombian wiretaps gave the Colombian arresting authorities precise knowledge of where at least five of them were, so that any delay in their Colombian arrest was unjustified, it is undisputed that even with the extra time, the Colombian authorities were unable to arrest Defendant Simmonds-Gallardo. It was only when this Defendant contacted DEA months later that the process for his voluntary surrender began. Because he was at large, he had the most control over the time of his arrest in the United States which was on October 29, 2009. Thus, eight months of the 16-month delay was in the Defendant's control.

As to this factor, it is clear that even if one attributes to the Government the delay attributable to the Colombian authorities and the State Department/U.S. Embassy process, both the Government and the Defendant are responsible for nearly half of the 16-month delay. Moreover, because only eight and a half months, which is less than the presumptively prejudicial one-year threshold to trigger a *Barker* analysis, can be attributed to the Government, this factor does not weigh against the Government and is a neutral factor.

### C. *Assertion of Speedy Trial Right*

The Government concedes that the Defendant timely asserted his rights to a speedy trial. Thus, this factor could be weighed against the Government but not heavily because the Defendant did not file his motion until two and a half months after his arrival in the United States.

### D. *Prejudice to Defendant*

Defendant Simmonds-Gallardo has not provided any evidence to show actual prejudice to his defense, such as facts to show that the delay weakened his ability to raise specific defenses, elicit specific testimony or produce specific items of evidence. Instead, he maintains that for this prong of his burden, he does not have to show specific prejudice but may simply rely on a presumption of prejudice under *Doggett* because the last substantive act alleged in the indictment occurred in 2003, nearly seven years ago, and thus, he only needs to argue generally that he cannot obtain phone records, that fading memories make it impossible to establish an alibi or reconstruct events with precision, and that generally un-named witnesses are unavailable.[29] Defendant relies on the Eleventh

---

[29]Defendant Simmonds-Gallardo has not argued he has suffered the two other types of *Doggett* presumptive prejudice, namely oppressive incarceration and anxiety accompanying public accusation. The superceding indictment was unsealed on March 17, 2009 [DE-552], a month after the unsuccessful attempt to arrest him in Colombia. He somehow learned of the indictment and made the arrangements for his October 29 self-surrender in the United States.

Circuit's decision in *Ingram* to support his proposition that because his post-indictment delay triggers the Sixth Amendment speedy trial analysis, it is appropriate to consider any inordinate pre-indictment delay in determining how heavily any post-indictment delay weighs against the Government. 446 F.3d at 1339. In *Ingram*, the appellate court cited *Doggett*, 505 U.S. at 655, to support this approach, stating: "The rationale for presuming prejudice is, after all, that 'excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.'" *Id.*

While it has been almost seven years since the last substantive act alleged in the indictment, this case does not present the same circumstances that caused the *Ingram* court to reverse the conviction and remand with instructions to dismiss the indictment. In evaluating Ingram's denied motion to dismiss,[30] the *Ingram* court concluded there was an inordinate pre-indictment delay which could be considered in determining how heavily any post-indictment delay weighs against the Government and whether a defendant is entitled to the presumption of prejudice and relieved of the burden of presenting affirmative evidence to prove the prejudice. In *Ingram*, the crime occurred in February 2000. The defendant was interviewed in March and again in July 2000 and gave the investigating ATF agent his contact information. At that time, there was sufficient evidence to indict. However, two and a half years passed before the indictment was returned and no action was taken during this time to prosecute the case. Between October 2002 and 2004, the agent undertook minimal efforts to contact Ingram, although he could have contacted Ingram's policeman brother to locate him, and he never informed Ingram of the indictment. When Ingram was finally told of the

---

[30]Ingram's motion was denied because the district court, adopting the magistrate judge's report and recommendation, found that Ingram was partially responsible for the delay and that he could not show actual prejudice.

indictment, in late July, 2004, he agreed to surrender six days later. In weighing the *Barker* factors

to determine whether there was a denial of Sixth Amendment rights, the *Ingram* court emphasized

that it is the Government's, not a defendant's, burden to bring a defendant to trial. *Ingram*, 446 F.3d

at 1337 (citing *Barker*, 407 U.S. at 527). It found that the two-year delay post-indictment triggered

a *Barker* inquiry, that the Government did not provide a reasonable explanation for its two-year

failure to execute the arrest warrant, and that the defendant had promptly asserted his Sixth

Amendment rights.   The appellate court concluded the two year post-indictment delay was

intolerable given the straight-forward nature of the crime (felon in possession), the state of the proof

against Ingram on the date of the indictment, and the Government's knowledge of where to find him.

Because the first three *Barker* factors weighed so heavily against the Government, the five-year delay

between the crime and the trial relieved Ingram of the burden of showing actual prejudice resulting

from the delay.[31]

Simmond-Gallardo's case differs in a number of ways from *Ingram*. First, this was not an

ordinary street crime but a large drug trafficking conspiracy stretching from Colombia, to Jamaica,

to the Bahamas into the United States. Second, once the sealed indictment was returned, efforts were

made over the course of eight and a half months to arrest this Defendant in Colombia. Granted

AUSA Cooley should not have delayed two and a half months in starting the PAW paperwork, but

his delay is a fraction of the two-year delay in *Ingram*. Because the Defendant was in a foreign

country, the process of effecting the arrest naturally entailed more time and coordination with

diplomatic officers as well as another sovereign's law enforcement personnel than a U.S. arrest.

Also, the number of defendants involved in the proposed takedown and the need to effect the arrests

---

[31]The *Ingram* court found that the defendant's Fifth Amendment due process claim due to
the two and one-half year pre-indictment delay was without merit. *Id.* at 1336 n.2.

at the same time to minimize a defendant being tipped off and fleeing is a reasonable consideration in the timing of an arrest. Moreover, efforts were made to arrest Simmonds-Gallardo in Colombia within eight and a half months of the return of the indictment. However, he managed to avoid arrest until he self-surrendered on October 29, 2009. The indictment was unsealed on March 17, 2009. While the record is not clear as to the exact date, it was a number of months later before Simmonds-Gallardo first contacted DEA to arrange his surrender. Again, because of the complexity of visa requirements given the pending indictment and the Defendant's desire to avoid Combita and the Colombian extradition process, the self-surrender also took time. From the unsealing of the indictment to Simmond-Gallardo's arrest in the United States only seven and a half months transpired. This amount of time would not meet the *Barker* analysis threshold.

In examining the first three *Barker* factors, the Court finds that none weighs heavily against the Government. If the delay is calculated from the date the indictment was unsealed,[32] the seven and half-month delay is insufficient to trigger a *Barker* analysis. If the delay is sufficient to trigger a *Barker* analysis, *i.e.*, counted from the date of the indictment's return, there is a reasonable explanation for the delay that cannot be attributed solely to the Government. Moreover, during the three-year period from when the Defendant was first brought to the Government's attention to the return of the Superceding Indictment, the Government did undertake reasonable investigative and prosecutorial action relating to the large conspiracy. Such is in direct contrast to the two years of no action in *Ingram*. Therefore, the Court finds that the Defendant cannot invoke *Ingram* to avoid his

---

[32]In *United States v. Marion*, 404 U.S. 307, 320-21 (1971), the United States Supreme Court implies that the Sixth Amendment protections attach when the indictment is unsealed or the defendant is arrested (whichever occurs first) because before that point neither the indicted defendant nor the public has notice of the charge thus the indictment does not bring about the "major evils protected against by the speedy trial guarantee."

-28-

obligation to submit affirmative evidence to establish the fourth *Barker* factor of actual prejudice. Because the Defendant did not provide any evidence of actual prejudice and the other three factors do not weigh against the Government, he has not met his burden to show his Sixth Amendment rights have been violated. Thus, the Court must deny Simmond-Gallardo's Motion to Dismiss the Indictment.

CONCLUSION

While the Court expressed concern at the outset of the evidentiary hearing as to the potential prejudice to the Defendants' defense arising from a seven-year delay, for the reasons discussed above, the Court concludes that their Fifth Amendment claims fail. As to their Sixth Amendment claims, the Court concludes that Defendants Ochoa-Mesa, Ceren, Heano-Toro, Munoz, Zuluaga-Ochoa and Cardona-Osorio have not met the threshold requirement for a *Barker* analysis. Therefore, their Sixth Amendment claims are without merit and their motions must be denied. In weighing the *Barker* factors as to Defendant Simmonds-Gallardo, the Court find that he has not sustained his burden to prove a violation of his Sixth Amendment rights, therefore, his motion to dismiss the indictment must be denied. Accordingly, it is

ORDERED that the Motions to Dismiss filed by Defendants Ochoa-Mesa, Simmonds-Gallardo and Ceren in which Defendants Henao-Toro, Munoz, Zuluaga-Ocha, and Cardona-Osorio have joined [DE-694,696,701, and 739] are DENIED.

DONE and ORDERED in Miami, Florida this 12th day of April, 2010.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

Copies furnished to:
All Counsel of Record